Van Ness, J.
delivered the opinion of the court. The single question which arises in this case, viz. whether the assurers are bound to refund the sum paid by the plaintiffs for general average, according to the adjustment made at Lisbon, does not appear to have been settled by any decision of this court. One thing, however, is certain, that the underwriters must be held liable, either for the amount thus "paid, or according to the rule laid down by this court in a case that will be presently noticed; the rule contended for, in behalf of the defendants, being totally inadmissible. The first time, I believe, the effect of a foreign adjustment came before the court, was in the case of Lenox v. The United Insurance Company. (3 Johns. Cases, 178.) The question there was, whether the plaintiff should recover a partial loss only, or the amount paid on the adjustment of a general, average at Lisbon,- and it was decided that he should recover a, partial loss only, on the ground that, according to our law, the staves on the deck of the vessel, thrown overboard in a storm, to lighten her, could not be brought into a general average. What would have been the effect of this adjustment, if the jettison had, according to the laws' of this country, formed a proper item in making it up, is left undetermined.
The next case is Leavenworth v. Delafield, (1 Caines’ Rep. 573.) in which the adjustment took place at New-York, the port of lading, upon the return of the ship. The rule laid down in *333 that case does not, therefore, apply here, nor is it at all intended, fey any thing now about to be decided, to question or impugn the authority of that decision. There is another case in which this point was touched by three of the judges, but nothing was decided. I mean Schmidt v. The United Insurance Company. (1 Johns. Rep. 249).) A general average had been settled at Embden, which was disregarded, one of the judges supposing-it must already have been paid out of a fund belonging to the underwriters ; by another, because the charges and expenses, brought into the account, v/ere not covered by the policy, and, therefore, not recoverable against the assurers ; and the third did not assign his reasons. We must, therefore, endeavour to ascertain what the rule is in that country from which we have derived most of this branch of our law. The usages and practice of England, before the revolution, as well in cases of this kind as in any others, are binding upon this court, as part of the common law; and it is only where the common law is silent, that we are at liberty to seek for other guides, or to establish a rule for ourselves.
In the researches which I have made, I have not been able \ to find a single case where a different rule has been adopted, as I between the owners of the ship and cargo, and as between the / assurer and assured. The general average once being made, and the amount of contribution between the owners of the ship, i freight, and cargo ascertained, it appears, at least nothing appears 1 to the contrary, that the underwriters have been held liable for J such amount. In Leavenworth v. Delafield, Mr. Justice Livingston, who delivered the opinion of the court, after stating what \ would be just and proper, as between the owners, concludes by I observing, “ the same course of adjustment must be pursued be-1 tween the underwriters.” Indeed, it seems to me that this/ view of the subject would be conclusive to show that a boim\ * fide adjustment and payment of a general average ought to be the measm e of damages, as between the merchant and insured; otherwise, an insurance would cease to be what it has always' been contemplated, a contract of indemnity. In this case <e it ' is distinctly admitted, that, as it respects the owners of the cargo and the owners of the vessel, the average was correctly . stated, and rightfully paid in Lisbon! That this is a loss, for $, which the assurers are liable, is not disputed, and there is no *334 principle more firmly established than that they are bound t© return the money which the assured has been obliged to advanee in consequence of any peril within the policy, provided ^ and honestly paid, and does not exceed the amount of the subscription. This was the doctrine of this court, in the case of Gracie v. The New-York Insurance Company, (8 Johns. Rep. 337.) where the effect and consequence of the cargo’s arriving at a losing or falling market, as it respected the underwriters, is very fully discussed, and need not here be repeated. Many of the principles decided in that case apply with full force to the view I am now taking of the case under consideration. The sum paid by the plaintiff in that case was compulsory; it, in fact, amounted to a total loss; but having been paid to extricate the cargo from a situation in which it became placed by an act for which the underwriters were answerable, they were held bound to refund it. The payment in the present case was also compulsory. It was the master’s duty, on his arrival at Lisbon, to settle the contribution, and to detain the cargo on board until it was paid ; for the owners of the ship have a lien on the goods on board, not only for the freight, but also to answer all averages and contributions that may be due. (Malyn’s Lex Merc. 113. Molloy, c. 6. s. 8. 15. Marshall, 544 Abbott on Shipping, 296.) The master, in this case, procured the average to be adjusted, and refused to deliver the cargo until the amount of the contribution charged upon it was paid or secured. What was the consignee to do in such a case 1 As between the owners, the sum demanded was just. ■ The captain’s right and duty to detain the cargo till it should be paid, was undisputed. The only proper course was pursued, and theunderwriters are bound by their contract to make a complete indemnity.
I proceed to show that the settled usage and practice in England, for upwards of a century, has been in conformity with the principles I have stated. Adjudged cases, except of modern date, are not to be met with; the reason of which, no doubt, is, because the law and practice, in that country, have been generally considered as settled and established. Marshall (545, 546.) says, “the mode of ascertaining the amount of each person’s contribution, is not very correctly defined in our Taws; it is usually done upon the ship’s arrival at the port of *335 discharge, by ascertaining the net value of the ship, freight, and cargo, as if nothing had been lost; these are to be valued at the price they would fetch at the port of discharge, and the £net amount, after deducting all charges, is the sum which is subject to the contribution.” In case of jettison, it was formerly the custom to value the goods at prime cost, if the loss happened before half of the voyage was performed; but if after, then at the price they would have borne at the port of delivery. This ^distinction is now exploded, and it has become the settled prac- ■' tice to estimate the goods lost, as well as those saved, at the Í. price they would have fetched at the port of discharge on the, ship’s arrival there, freight being deducted. The opinion of1) Abbott, always deserving very great respect, is to the same ef-1 feet. After alluding to the ancient custom just mentioned, he observes, “But here the last valuation (that is, the price the goods would have fetched at the port of, destination) is adopted in all cases where the average is adjusted after the ship’s arrival at the place of destination, and appears best to agree with the nature of the subjects.” (Abbott on Ships, 292.) It is supposed that he confines the rule to the settlement of the contribution between the owners; and this is inferred from the following passage: “For, although, as between the merchant and the insurer, the prime cost is the only value, the contract of insurance being a contract of indemnity against loss, and not a contract of security of gain; yet, in this case, equity requires that the person,” &c. Taking this in connexion with what precedes and follows it, the writer, I think, means to be ■ understood thus: as a general rule between the merchant and I the insurer, that prime cost is the only value; yet, in case of a jettison, where the average is adjusted at the port of discharge, the practice is otherwise. The first he lays down as the general rule, the last as the exception; and so Mr. Justice Livingston understood this passage, in Leavenworth v. Delafield. It is true, the elementary writers on this subject, in laying down the English rule, speak of an average arising from jettison, but there certainly is no ground for a distinction, whether it arise from that cause, or from a sacrifice of part of the ship, or her apparel or tackle, for the common benefit and safety. Park fully agrees with both these writers, and alter giving the opinion of Roccus on this subject, who appears to hold the same doctrine, he observes, “ The opinion of this learned civilian is *336 agreeable to the laws of all the trading powers on the continent 0f £urope, as well as those of England, where the insurer engages to indemnify against all losses arising from a general average.” Here I cannot avoid again adverting to what I haveljl before noticed, as affording the most satisfactory proof that the law and practice in England are such as I have supposed, namely, that it is the duty of the master to cause an adjustment to be made upon his arrival at the port of destination, and that he has a lien upon the cargo to enforce the payment of the contribution. (See, also, 2 Mag. 59, 60. 69. 173. Molloy, c. 6. s. 15. Mar. Ordin. France, tit. 8. s. 6.21. Laws of Oler. art. 8. Laws of Wisbuy, art. 22. Appendix to 2 Pet. Ad. Decis. Ordin. of Antwerp, 2 Magens, 16. Ordin. of Amsterdam, Ib. 141. s. 35. Ordin. of Konigsberg, Ib. 207, 208. s. 37, 38. Ordin. of Bilboa, 405. s. 35.)
In conformity to what I have said, the two modern cases of Newman v. Cazalet, and Walpole v. Ewer, seem to have been decided. The former was a suit to recover from the underwriter the amount of a general average adjusted by the commercial court of Pisa, in which several items were charged, which, according to the English usage, would not have been allowed. It was proved by several brokers that in repeated instances they had adjusted averages under similar sentences in the court of Pisa, and the underwriters, though with reluctance, had always paid them. Buller, J. before whom the cause was tried, says, “ that on the general law, the plaintiffs would fail, but in all matters of trade usage is a sacred thing. I do not like these foreign settlements of average, which make underwriters liable for more than the standard of English law.” The cause was left to the jury upon the point of usage, and the plaintiff recovered. The usage here proved, I consider to be evidence that this was the usage of all England, and part of the common law of that country. Indeed, I know of no “ standard of English law” contrary to it, unless the learned judge meant that when an adjustment of an average takes place, upon the return of-the ship to an English port, immediately after a disaster, the prime cost is the value, because the price at the port of destination is in such case unknown. {Abbott, 293.) The other case was an action on a policy upon a respondentia bond on ship, and goods. The ship was Danish, and an average loss was sustained upon the *337 goods, of 62. 15s. per cent., and the plaintiff, as the holder of -a. respondentia bond, was called on to contribute, and then brought his action against the English underwriters for the amount of that contribution. Lord Kenyon held the underwriters liable, notwithstanding that, by the laws of England, a lender upon respondentia is not liable ■ to average losses. {Parh9 565, 566.) In both these cases, the amount paid by the assured was the measure of damages against the underwriters. Whether the English law and usage are the best that can be devised, is not the question. We must take the rule as we find It, and leave any amelioration of which it may admit, to another department of the government. I cannot doubt, that at this day, the underwriters in England are uniformly held responsible for the amount fairly paid under a foreign adjustment of an average loss.
Judgment for the plaintiffs.